1  Michael W. Chen, Esquire
   Arizona Bar No. 17967
2  THE COOPER CASTLE LAW FIRM
   A Multi-Jurisdictional Law Firm
3  820 South Valley View Blvd.
   Las Vegas, NV 89107
4  (702) 435-4175/(702) 435 4181 (facsimile)
   Loan No. 1100160835 / Our File No. 0804-1913

5

   Attorney for Secured Creditor
6  America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL

7            UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF ARIZONA

8
   In re:
9

10                                          CHAPTER 13

11     RACHEL M. MOLINE

              Debtor(s)                      BANKRUPTCY NO.: 07-06377-PHX-CGC
12  _____

13  America's Servicing Company, as
    servicing agent for LEHMAN SUB
14  CAPITAL

15              Movant(s)
    v.
16     RACHEL M. MOLINE, Debtor(s)
    Russell A. Brown, Trustee,
17
              Respondant(s)
18  _____

19       **MOTION FOR RELIEF FROM THE AUTOMATIC STAY**
20           **RE: DEBTOR AND BANKRUPTCY ESTATE**

21  TO:  **RACHEL M. MOLINE, DEBTOR(S)**

22  TO:  **Mark R. Atchley, Esq., ATTORNEY FOR THE DEBTOR(S)**

23  TO:  **Russell A. Brown, CHAPTER 13, TRUSTEE**

24  TO:  **ALL INTERESTED PARTIES**

25

TO:   **THE CLERK OF THE ABOVE-ENTITLED COURT**

Secured Creditor, America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL, hereby moves this Honorable Court for an order terminating the automatic stay re: Debtor and Bankruptcy Estate to allow America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL to proceed with and complete any and all contractual and statutory remedies available pertaining to America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL's security interest held in the real property located at 3236 E Presidio Rd. Phoenix, Arizona 85032 ("Property"). This Motion is made and based on an amalgamation of the instant pleading and exhibits and all other pleadings, statements and schedules on file herein.

## FACTS

1. On or about November 28, 2005, a loan was originated on the property located at 3236 E Presidio Rd. Phoenix, Arizona 85032, secured and encumbered by a Deed of Trust, which is in favor of LEHMAN SUB CAPITAL. A copy of the note and deed of trust are attached hereto as Exhibit "A".

2. The principal balance of the note at the time of this motion is approximately $197,600.00.

3. The regular monthly payment under the note is due on the 1st day of each month and the amount required is $1,847.53. A late fee of $56.60 applies for each and every payment, which is not received timely. Interest accrues at the rate of 6.8800%.

4. Debtor(s) filed their voluntary Chapter 13 on November 28, 2007.

5. The Debtors' first post-petition payment was to be made on December 01, 2007.

6. The Debtors' Chapter 13 plan was set for confirmation and provides that America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL is to receive direct payments outside the plan for post-petition payments. The Debtors have failed to make said direct payments for the months of February 2008 through April 2008 to the 1st.

7. The Debtor owes a total of $5,542.59 in post-petition arrears as described in the

1  Affidavit in Support of Motion for Relief, attached hereto as Exhibit "B". In addition, Bankruptcy

2  Attorney Fee of $650.00 and Filing fee of $150.00 has been incurred in bringing this Motion.

3      8.  The Debtor owes a total of $26,138.94 in pre-petition arrears as described in the Proof

4  of Claim filed on December 14, 2007.

5      9.  The total amount of pre-petition and post-petition arrearages, $31,681.53 plus the

6  principal balance $197,600.00 in the total amount of $229,281.53, along with junior lien(s) in the

7  approximate amount of $49,500.00, demonstrate a disproportionate debt balance encumbering the

8  real property at issue as the estimated property value ranges from $195,500.00 to $280,000.00 as

9  indicated in the Zillow estimated property value and the Debtor's own estimation in Schedule A of

10  the voluntary petition. A copy of the Zillow and Debtor's schedule A of the petition are attached

11  hereto as Exhibit "C."

12      10.  Pursuant to LR 4001(b), a five (5) day notice regarding delinquency was sent via

13  facsimile to the Debtor's Counsel on April 14, 2008. The letter is attached hereto as Exhibit "D".

14  No response has been received from the interested parties.

15
16  **POINTS AND AUTHORITIES**

17  The Bankruptcy Code provides for relief from the automatic stay:

        (1) For cause, including the lack of adequate protection of an interest

18          in property of such party in interest;

19          11 U.S.C. §362(d)(1).

20  There is very little case law on what constitutes "cause" for purposes of §362(d)(1). Most

21  of the reported §362(d)(1) cases involve the specific example of cause set out in the statute: "lack

22  of adequate protection of an interest in property of such party in interest." 11 U.S.C. §362(d)(1).

23  The term "adequate protection" is not expressly defined in the Bankruptcy Code, §361 of the Code

24  sets forth three non-exclusive examples of what may constitute adequate protection:

25

1.   Periodic cash payments;

2.   An additional replacement lien; or

3.   Such other relief as will result in the realization by the creditor of the indubitable equivalent of its interest in the property.

In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984); In re Monroe Park, 17 B.R. 934, 937 (D.Del. 1982).

The concept of adequate protection requires Debtors to propose some form of protection that will preserve the secured creditor's interest in the collateral pending the outcome of the bankruptcy proceeding. In re Monroe Park, 17 B.R. at 937.

Debtor has not proposed or offered America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL any form of adequate protection, and under 11 U.S.C. §362(d) the Debtor must demonstrate that America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL has been adequately protected. See also In re Schaller, 27 B.R. 959 (W.D. Wis. 1983). Any attempts by the Debtor to sell the property or repay the arrearages past a six-month period will serve to create a default in violation of the basis tenets of adequate protection rather than curing the same.

If there exists sufficient equity in secured property, the collateral itself may provide adequate protection. Although the existence of such an "equity cushion" as a method of adequate protection is not specifically mentioned in the Code, it is the classic form of protection for a secured debt. In re Mellor, 734 F.2d at 1400. An equity cushion is defined as the "value in the property above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay re: Debtor and Bankruptcy Estate remains in effect." La Jolla Mortgage Fund v. Rancho El Cajon Assoc., 18 B.R. 283, 287

1  (S.D. Cal 1982) citing from In re Roane, 8 B.R. 997, 1000 (E.D. Pa. 1981), Aff'd sub nom.,

2  Employees Retirement Fund v. Roane, 14 B.R. 542 (E.D. Pa. 1981).

3          The Code provides that the valuation of collateral is to be made in light of both the reason

4  the valuation is being made, and the proposed use or disposition of the collateral. 3 Collier on

5  Bankruptcy, §506.04[2], at 506-25 (15th ed. 1979). The valuation of collateral for purposes of a lift-

6  stay motion differs from that at the plan-confirmation stage. In re B.B.T., 11 B.R. 224, 229 n.10

7  (D.Nev.1981). In the present context, for the determination of whether adequate protection exists,

8  the appropriate value is the wholesale/liquidation value because the liquidation value is what a lift-

9  stay movant will most likely receive upon termination of the automatic stay re: Debtor and

10  Bankruptcy Estate after all fees and costs of foreclosure, sale and conveyance are considered.

11  America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL would assert that

    any equity cushion which might exist will be fully exhausted by interest which continues to accrue,

12  foreclosure costs and attorneys' fees.

13          More importantly, even the actual existence of an equity cushion does not constitute

14  adequate protection, especially if in the event where the Debtor is not paying taxes or insurance

15  premiums on the property or is allowing the condition or value of the property to deteriorate. In

16  re Pleasant Valley, Inc., 2 C.B.C.2d 325 (D.Nev. 1980); In re Bouquet Investments, Inc., 32 B.R.

17  988 (C.D. Cal. 1983). Relief for cause may also be granted where there has been improper

18  management of collateral. See In re G.W.F. Investments, Ltd., 32 B.R. 308 (S.D. Ohio, 1983).

19  Thus, relief from the automatic stay must be granted if the Debtor cannot establish that the

20  property interest is adequately protected. In re Bradley, 3 B.R. 313, 315-16 (Bankr. E.D. Va.

21  1980).

22          Procedurally, a lift-stay movant has the burden to establish prima facie facts entitling it to

23  relief. See In re Elmore, 94 B.R. 670 (Bankr. C.D.Cal. 1988). To establish a prima facie case,

24  the moving creditor must demonstrate the following:
                 The Debtor owes the obligation to the Creditor;

25

1   There is a valid security interest from which relief from the stay may
    be sought; or
2          "Cause" justifying relief from the stay.

3   In re Kin, 71B.R. 1011, 1015 (Bankr. C.D.Cal. 1987). After a creditor has established its prima
4   facie case, the burden of proof shifts to the debtor to prove that there is no cause to terminate the
5   automatic stay. 11 U.S.C. § 362(g)(2); In re Ellis, 60 B.R. 432, 435 (9th Cir. B.A.P. 1985) citing
6   In re Gauvin, 24 B.R. 578 (9th Cir. B.A.P. 1982).

7          It is clear in the instant case that America's Servicing Company, as servicing agent for
8   LEHMAN SUB CAPITAL is not protected by an "equity cushion" or any other adequate
9   protection measure. Accordingly, America's Servicing Company, as servicing agent for
10  LEHMAN SUB CAPITAL has demonstrated its prima facie case that cause exists "justifying
11  relief from the automatic stay" under Bankruptcy Code § 362(d)(1). Based upon the foregoing
12  authorityAmerica's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL is
    entitled to an order terminating the automatic stay re: Debtor and Bankruptcy Estate. America's
13  Servicing Company, as servicing agent for LEHMAN SUB CAPITAL respectfully requests that
14  the Court determine that the Creditor is not adequately protected and allow the Creditor to lift the
15  stay re: Debtor and Bankruptcy Estate and secure its collateral at no further costs to the Estate
16  and its unsecured creditors.

17         WHEREFORE, America's Servicing Company, as servicing agent for LEHMAN SUB
18  CAPITAL, SECURED CREDITOR respectfully requests:

19      1.    That relief from the automatic stay re: Debtor and Bankruptcy Estate be granted to
              allow America's Servicing Company, as servicing agent for LEHMAN SUB
20            CAPITAL to foreclose on its lien and/or use any and all other methods both
              contractually and statutorily to regain possessory interest and title to the subject
21            property under the note and deed of trust referenced herein and attached hereto;

22      2.    Award reasonable attorneys fees and costs to America's Servicing Company, as
              servicing agent for LEHMAN SUB CAPITAL;

23      3.    Waive the 10 day requirement under Fed R. Bank.Pro. 4001(a)(3); and

24  ///

25  ///

1    4.    Award all other remedies that the Court may find reasonable and just.

2

3    Date: _____        Michael W. Chen, Esquire
                                   Arizona Bar No. 17967
4                                  THE COOPER CASTLE LAW FIRM
                                   A Multi-Jurisdictional Law Firm
5                                  820 South Valley View Boulevard
                                   Las Vegas, Nevada  89107
6                                  (702) 435-4175
                                   Attorney for Secured Creditor-
7                                  America's Servicing Company, as servicing agent for
                                   LEHMAN SUB CAPITAL

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# ADJUSTABLE RATE NOTE
### (LIBOR Index - Rate Caps)

MIN  100052300423167450

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

11/28/05
[Date]

IRVINE
[City]

CA
[State]

3236 E PRESIDIO RD, PHOENIX, AZ 85032-6122
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    197,600.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
    Finance America, LLC, dba FinAm, LLC
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.875    %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on    JANUARY  01, 2006    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    DECEMBER  01, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    OCWEN Loan Servicing LLC
    P.O. Box 785056, Orlando, FL 32878-5056
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $    1,132.08    . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family - Freddie Mac UNIFORM INSTRUMENT      Form 3590 1/01

VMP-815N (0005).01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 4          Initials: RM

MDAC

LOAN ID: 0042316745

# EXHIBIT A

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates
The interest rate I will pay may change on the first day of       DECEMBER  01, 2007  , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding       FIVE AND 75/100                       percentage points (       5.750            %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than        9.875        % or less than        6.875        %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than        12.875        %.  My interest rate will never be lower than the initial interest rate stated in Paragraph 2 of this Note.

### (E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 3520 7/01
Initials

-815N (0006).01

MDAK

LOAN ID: 0042316745

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has *not received the full amount* of any monthly payment by the end of    FIFTEEN    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000        % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

-815N (0005).01

Page 3 of 4

Form 3890

MDAS

LOAN ID: 0042316745

**Transfer of the Property or a Beneficial Interest in Borrower**. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
RACHEL MOLINE                      -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                   -Borrower                                      -Borrower

*[Sign Original Only]*

Form 3590 1/01

-815N (0005).01

MEAA

LOAN ID: 0042316745

## INTEREST-ONLY ADDENDUM TO
## ADJUSTABLE RATE PROMISSORY NOTE

**THIS ADDENDUM PROVIDES FOR INTEREST-ONLY PAYMENTS FOR THE FIRST FIVE (5) YEARS OF THE NOTE (THE "INTEREST-ONLY PHASE"). UNLESS VOLUNTARY PREPAYMENTS OF PRINCIPAL ARE MADE IN ADDITION TO THE SCHEDULED MONTHLY PAYMENT, THERE WILL BE NO PRINCIPAL REDUCTION DURING THE INTEREST-ONLY PHASE.**

This Interest-Only Addendum to Adjustable Rate Note (the "Addendum") is made this 28th day of NOVEMBER , 2005 and shall amend and supplement the Adjustable Rate Note (the "Note") executed by the undersigned Borrowers as of the same date as this Addendum in favor of Finance America, LLC (the "Lender"). In the event of conflict, the terms of this Addendum shall control over the terms of the Note.

Sections 3(A), 3(B), 4(C), and 7(A) of the Note are deleted and replaced in their entirety by the following;

### 3. PAYMENTS
**(A) Time and Place of Payments**
The first sixty (60) monthly payments on this loan will be interest-only and will be in an amount sufficient to pay interest as it accrues on the principal balance which may be reduced by voluntary prepayments as described in Section 4(C) ("Interest-Only Period"). I will pay principal and interest by making payments every month thereafter for the next three hundred (300) monthly payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

I will make monthly payments on the first day of the month beginning on JANUARY 01, 2006 I will make these payments every month until I have paid all of the principal, interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on DECEMBER 01, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the Maturity Date.

VMP Mortgage Solutions, Inc. (800)521-7291

1961225 (0411)

INT4

LOAN ID: 0042316745

I will make monthly payments at OCWEN Loan Servicing LLC
P.O. Box 785056 Orlando, FL 32878-5056
or a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

My monthly payment will be in the amount of U.S.
$ 1,132.08 . This payment amount is based on the original principal balance of the Note. This amount may change. The Note Holder will notify me prior to the date of change in the monthly payment.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 75/100 percentage points ( 5.750 %) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, at each Change Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the Change Date following the end of the Interest-Only Period (i.e., the Change Date prior to the 61st payment or "First Fully-Amortizing Change Date") unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the First Fully-Amortizing Change Date and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the First Fully-Amortizing Change Date or subsequent Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments except in accordance with Section 5 of this Note.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest during the Interest-Only Period and 5.000 % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

| | |
|---|---|
| _Rachel M. Moline_ | 11·28·05 |
| Borrower    RACHEL MOLINE | Date |
| | |
| Borrower | Date |
| | |
| BORROWER | DATE |
| | |
| BORROWER | DATE |
| | |
| BORROWER | DATE |
| | |
| BORROWER | DATE |

LOAN ID: 0042316745

Finance America, LLC, dba FinAm, LLC
16802 Aston Street
Irvine, CA 92606

# ALLONGE

Loan number: ___0042316745_____

Borrower name: _RACHEL MOLINE_____

Pay to the order of _____
Without recourse   Finance America, LLC, dba FinAm, LLC

*[signature]*

JEANNE D. STAFFORD
Loan Document Administration Supervisor

_____

AUTHORIZED OFFICER

-1198143 (9908)      ELECTRONIC LASER FORMS, INC. - (800)327-0545      May 1999

LOAN ID:0042316745

ARDD

Return To:
Finance America, LLC,
dba FinAm, LLC
P.O. BOX 16637
Irvine, Ca 92623-6637

I do hereby certify this to be a true
and correct copy of the original.
Security Title Agency

By: _____

Prepared By:
Julia L Greenfield
16802 Aston Street
Irvine, CA 92606

Name
of Finance America, LLC do hereby
certify that this is a true, correct, and
complete copy of the original.

———————— [Space Above This Line For Recording Data] ————————

# DEED OF TRUST

MIN   100052300423167450

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated   NOVEMBER  28, 2005
together with all Riders to this document.

**(B) "Borrower"** is
RACHEL MOLINE, A MARRIED WOMAN AS HER SOLE AND
SEPARATE PROPERTY

Borrower is the trustor under this Security Instrument Borrower's mailing address is
     3236 E PRESIDIO RD PHOENIX, AZ 85032
**(C) "Lender"** is Finance America, LLC, dba FinAm, LLC

Lender is a        Limited Liability Company
organized and existing under the laws of         Delaware

ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3003  1/01 (rev. 6/02)

-6A(AZ) (0208)
Page 1 of 15                              Initials:
     VMP MORTGAGE FORMS - (800)521-7291

AZAA

LOAN ID: 0042316745

Lender's mailing address is 16802 Aston Street, Irvine, CA 92606

(D) "Trustee" is    FIDELITY NATIONAL TITLE INS CO

. Trustee's mailing address is

2390 E. CAMELBACK RD, STE 140
PHOENIX, AZ 85016

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated    NOVEMBER  28, 2005
The Note states that Borrower owes Lender
ONE HUNDRED NINETY-SEVEN THOUSAND SIX HUNDRED AND NO/100                   Dollars
(U.S. $    197,600.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    DECEMBER  01, 2035

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [xx] Other(s) [specify] Legal Description |
| | | XX Prepayment Rider |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

Form 3003  1/01 (rev. 6/02)

-6A(AZ) (0308)
AZAB

LOAN ID: 0042316745

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                              of              MARICOPA                          :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]


LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF


Parcel ID Number: 16651026                               which currently has the address of
                                    3236 E PRESIDIO RD                                      [Street]
          PHOENIX                                         [City], Arizona 85032-6122 [Zip Code]
("Property Address"):  3236 E PRESIDIO RD, PHOENIX, AZ 85032-6122

      TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Initial:

-6A(AZ) (0208)                    Page 3 of 15                    Form 3003  1/01 (rev. 6/02)
AZAC
                                                                  LLOAN ID: 0042316745

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials: _____

-6A(AZ) (0208)

AZAD

Form 3003  1/01 (rev. 6/02)

LOAN ID: 0042316745

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials:
Form 3003 1/01 (rev. 6/02)
LOAN ID: 0042316745

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials ____

-6A(AZ) (0208)     Page 6 of 15     Form 3003  1/01 (rev. 6/02)
AZAF                                 LOAN ID: 0042316745

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials

Form 3003   1/01  (rev. 6/02)

LOAN ID: 0042316745

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) *Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.*

Initials: [handwritten initials]

-6A(AZ) (0208)     Page 8 of 15     Form 3003  1/01 (rev. 6/02)

AZAH

LOAN ID: 0042316745

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6A(AZ) (0208)

AZAI

Page 9 of 15

Initials:

Form 3003  1/01  (rev. 6/02)

LOAN ID: 0042316745

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials

Form 3003 1/01 (rev. 6/02)

AZAJ

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials

-6A(AZ) (0208)

AZAK

Form 3003 1/01 (rev. 6/02)

LOAN ID: 0042316745

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(AZ) (0206)
AZAL

Page 12 of 16

Initials:

Form 3003 1/01 (rev. 6/02)

LOAN ID: 0042316745

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

Initials:

Form 3003   1/01 (rev. 6/02)

LOAN ID: 0042316745

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
RACHEL ROLFE                    -Borrower

_____        _____ (Seal)
                                            -Borrower

_____ (Seal)   _____ (Seal)
                       -Borrower                     -Borrower

_____ (Seal)   _____ (Seal)
                       -Borrower                     -Borrower

_____ (Seal)   _____ (Seal)
                       -Borrower                     -Borrower

@ -6H(AL) (9904)
AMM
Page 14 of 15
Form 3009 - 3/01 [ind. telq]

-6H(AL)
ADST
©2000-0AF Sunning, Inc. The borrower of this form is valid if it is printed without any printed notice in this document.
Page 1 of 1

STATE OF ARIZONA,  *Maricopa* County ss:

The foregoing instrument was acknowledged before me this *28th, November, 2005*

by  *RACHEL MOLINE*

My Commission Expires:  *4/15/07*

_Connie M Rymer_
_Connie M Sandstrom_
Notary Public

CONNIE M. SANDSTROM
Notary Public – Arizona
Maricopa County
Expires 04/15/07

-6A(AZ) (0208)                    Page 16 of 16                    Initials: _____  Form 3003  1/01  (rev. 6/02)

                                                                   LOAN ID: 0042316745

AZAO

## "EXHIBIT A"
## LEGAL DESCRIPTION

Lot 102 of Paradise Valley Oasis 2, according to Book 96 of Maps, Page 24, Records of Maricopa County, Arizona.

RECORDING REQUESTED BY, AND
WHEN RECORDED MAIL TO:

Finance America, LLC, dba FinAm, LLC
P.O. Box 16637
Irvine, Ca 92623-6637

_____
(Space above this line for Recorder's use)

**PREPAYMENT RIDER**   MIN   100052300423167430
           DATE:    11/18/05

FOR VALUE RECEIVED, the undersigned ("Borrower") agree(s) that the following provisions shall be
incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed of even date herewith (the "Security Instrument") executed by Borrower, as trustor, in favor of

   Finance America, LLC, dba FinAm, LLC              ("Lender"),
as beneficiary, and also into that certain promissory note (the "Note") of even date herewith executed by
Borrower in favor of Lender. To the extent that the provisions of this Prepayment Rider are inconsistent
with the provisions of the Security Instrument and/or the Note, the provisions of this Prepayment Rider
shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument and/or
the Note.

Section __5__ of the Note is amended to read in its entirety as follows:

_____     **MULTISTATE**
**FIRST MORTGAGE**                        (08/10/98)
                 Page 1 of 2
1196161 (02/03)        VMP MORTGAGE FORMS - (800)521-7291
ATUX

**" 5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of principal at any time before they are due, together with accrued interest. When I make a prepayment, I will tell the Note Holder in writing that I am doing so. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes. If within TWO      ( 2 ) years from the date of execution of the Security Instrument (as defined above) I make a full prepayment or partial prepayment(s), I will at the same time pay to the Note Holder a prepayment charge. An amount not exceeding twenty percent (20%) of the original principal amount may be prepaid in any twelve-month period without penalty. A prepayment charge will be imposed on any amount prepaid in any twelve-month period in excess of twenty percent (20%) of the original principal amount of the loan which charge shall not exceed an amount equal to the payment of six months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

IN WITNESS WHEREOF, the Borrower has executed this Prepayment Rider on the   28    day of   November 2005

Borrower   RACHEL MOLINE             Borrower

Borrower                           Borrower

**MULTISTATE**
(09/10/98)

**FIRST MORTGAGE**

1398181 (02:3)            Page 2 of 3

ATUY                             LOAN ID: 0042316745

RECORDING REQUESTED BY, AND
WHEN RECORDED, MAIL TO:

Finance America, LLC, dba FinA
16802 Aston Street
Irvine, CA 92606

Order No. 83052254/SG/SEN
Escrow No. 83052254/SG/SEN
MERS No. 100052300423167450
Loan No. 0042316745

SPACE ABOVE THIS LINE FOR RECORDING DATA

## ADJUSTABLE RATE RIDER
(Libor Index - Rate Caps)
INTEREST-ONLY PAYMENTS

This ADJUSTABLE RATE RIDER is made this _28th_ day of
_NOVEMBER_ , _2005_ , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust or Deed to Secure Debt (the "Security Instrument")
of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
Finance America, LLC (the "Lender") of the same date and covering the property described in
the Security Instrument and located at:
3236 E PRESIDIO RD PHOENIX, AZ 85032-6122
(Property Address)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN
THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements
made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of _6.875_ %.
The Note provides for changes in the interest rate and monthly payments, as follows:

1

1961224 (0411)    VMP Mortgage Solutions, Inc. (800)521-7291

INT1                    LOAN ID: 0042316745

# 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Date**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of DECEMBER 01, 2007 , and the adjustable interest rate I will pay may change on that day every sixth (6th) month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate and each date thereafter on which my adjustable interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the date of the first business day of the month immediately preceding the month in which a Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based on comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 75/100 percentage points ( 5.75 %) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, at each Change Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be my monthly payment until the earlier of the next Change Date or the Change Date following the end of the Interest-Only Period (i.e., the Change Date prior to the 61st payment or "First Fully-Amortizing Change Date") unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced by the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the First Fully-Amortizing Change Date and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the First Fully-Amortizing Change Date or subsequent Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments except in accordance with Section 5 of the Note.

**(D) Limits on Interest Rate Changes**

The interest rate that I am required to pay at the first Change Date will not be greater than 9.875 % or less than 5.875 %). Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one

percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than __12.875__ %.

#### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

#### (F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who can answer any question I may have regarding the notice.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Borrower  RACHEL MOLINE

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

1961224 (9811)
INX3

3

LOAN ID: 0042316745

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**
**PHOENIX DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 07-06377-PHX-CGC |
| RACHEL M MOLINE | § | |
| DEBTOR | § | CHAPTER 13 |
| | § | |
| AMERICA'S SERVICING COMPANY | § | |
| MOVANT | § | |
| VS | § | |
| RACHEL M MOLINE | § | |
| | § | |
| AND RUSSELL A. BROWN, TRUSTEE | | |
| RESPONDENTS | | |

AFFIDAVIT OF ___Teressa J. Williams___
IN SUPPORT OF MOTION FOR RELIEF

I,___Teressa J. Williams___, hereby state the following:

1.    I am the___Assistant Secretary___of America's Servicing Company ("Movant") and its successors and/or assigns, and hereby make this Affidavit in such capacity.

2.    America's Servicing is a corporation organized under the laws of the State of South Carolina, and is authorized to sue on its own behalf.

3.    I am a custodian of records for America's Servicing, as servicing agent for LEHMAN SUB CAPITAL ("LEHMAN SUB CAPITAL"). In the course of my employment, I have become familiar with the manner and method in which America's Servicing maintains its books and records in its regular course of business. Those books and records are managed by employees and agents whose duty it is to keep the books and records accurately and completely and to record each event or item at or near the time of the event or item so noted.

4.    I have reviewed the books and records which reveal that Movant is the owner and holder of the following Note secured by Deed of Trust of even date therewith covering certain real property located at 3236 E Presidio Rd, Phoenix, Arizona 85032, and more particularly described in the Deed of Trust. True and correct copies of the Note and Deed of Trust will be furnished to any interested party who requests same in writing from Movant's attorney.

   a.    Note Number xxxxxx0835, in the original principal amount of $197,600.00, dated November 28, 2005 and/or Deed of Trust was executed by Original Mortgagor Rachel Moline to Finance America, LLC.. Said Note was subsequently assigned through Assignment of Note.

AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM STAY-

# EXHIBIT B

b. Debtor is in default on his/her obligations to Movant in that Debtor has failed to make his/her installment payments when due and owing pursuant to the terms of the above-described Note.

c. As of April 14, 2008, the total indebtedness was $225,907.83. Debtor is in default on 15 pre-petition payments and 3 post-petition payments (February 2008 at $1,847.53, March 2008 at $1,847.53, April 2008 at $1,847.53). The amount of the current monthly mortgage installment payment is $1,847.53, and the monthly late charge is $56.60.

5. By failing to make the regular monthly installment payments due pursuant to the Note, Debtor has not provided adequate protection to Movant.

6. Movant has had to retain counsel to represent it before this Court and is incurring legal expenses and attorneys' fees for which it is entitled to reimbursement under the terms of the Note.

The foregoing facts are of my own personal knowledge and belief, and if called upon to appear as a witness, I could, and would, testify competently thereto. I declare under penalty of perjury that to the best of my knowledge, the foregoing facts are true and correct.

America's Servicing Company

By: _____

Teressa J. Williams
Assistant Secretary

SUBSCRIBED AND SWORN TO BEFORE ME on April 17 , 2008

Notary Public in and for the State of South Carolina

7695-N-8879



Bonny Mosca
Notary Public
State of South Carolina
My Commission Expires
December 15, 2015

-- beds, 2.5 baths, 1,367 sq ft

Views: 8

**Zestimate®: $195,500**
What's This?
**My Estimate:**

**Bird's Eye View**



**Home Info**
3236 East Presidio Road, Phoenix,
AZ

**Public Facts:**
Single family
2.5 bath
1,367 sqft
Lot 7,257 sqft
Built in 1962

**Neighborhood & School:**

**Neighborhood:**
 --
**School District:**
 --

**Charts & Data**

EXHIBIT C

4/22/2008

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |

|  | TOTAL | **280,000.00** |
|---|---|---|

(Report also on Summary of Schedules)

THE COOPER CASTLE LAW FIRM
A Multi-Jurisdictional Law Firm

820 South Valley View Blvd
Las Vegas, Nevada 89107
Telephone (702) 435-4175
Facsimile (702) 435-4181

April 14, 2008

Via Facsimile (480) 497-5029

Mark R. Atchley, Esq.
Atchley & Delgado, LLP
1819 E. Southern Avenue, Suite A-10
Mesa, AZ 85204

```
                              ********************
                              ***   TX REPORT   ***
                              ********************


          TRANSMISSION OK

          TX/RX NO           0343
          CONNECTION TEL              14804975029
          CONNECTION ID
          ST. TIME           04/14 13:51
          USAGE T            01'10
          PGS. SENT          3
          RESULT             OK
```

THE COOPER CASTLE LAW FIRM                    820 South Valley View Blvd
A Multi-Jurisdictional Law Firm               Las Vegas, Nevada 89107
                                              Telephone (702) 435-4175
                                              Facsimile (702) 435-4181


April 14, 2008                          Via Facsimile (480) 497-5029


Mark R. Atchley, Esq.
Atchley & Delgado, LLP
1819 E. Southern Avenue, Suite A-10
Mesa, AZ 85204

RE:    Debtor: RACHEL M. MOLINE
       Loan No.: 1100160835
       Bankruptcy No.07-06377-PHX-CGC
       Bankruptcy Chapter: 13
       Bankruptcy Filed On: November 28, 2007
       Our File No.: 0804-1913


Dear Attorney Atchley:

On April 14, 2008, we received authorization from our client, America's Servicing Company, to act on their behalf on the above referenced loan.

**Please see attached worksheet in compliance with Local Rule 4001.**

Your anticipated cooperation in this matter is greatly appreciated. If you have any questions, please do not hesitate to contact us.

Very truly yours,

THE COOPER CASTLE LAW FIRM

1   Michael W. Chen, Esquire
    Arizona Bar No. 17967
2   THE COOPER CASTLE LAW FIRM
    A Multi-Jurisdictional Law Firm
3   820 South Valley View Boulevard
    Las Vegas, Nevada 89107
4   (702) 435-4175/(702) 435 4181 (facsimile)
    Loan No. 1100160835 / Our File No. 0804-1913
5
    Attorney for Secured Creditor
6   America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL

7                   UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF ARIZONA
8
    In re:
9
                                              CHAPTER 13
10        RACHEL M. MOLINE,                    BANKRUPTCY NO.: 07-06377-PHX-CGC

11

12
                        Debtor(s)
13   _____

14   America's Servicing Company, as
     servicing agent for LEHMAN SUB
15   CAPITAL

16                      Movant(s)
     v.
17
          RACHEL M. MOLINE, Debtor(s),
18        Russell A. Brown, Trustee,

19                      Respondant(s)

20   _____

     **PROPOSED ORDER TERMINATING THE AUTOMATIC STAY**
21   **RE: DEBTOR AND BANKRUPTCY ESTATE**

22        IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, that the Automatic Stay re:

23   Debtor and Bankruptcy Estate in the above-entitled Bankruptcy case is immediately extinguished

24   for all purposes as to Secured Creditor, America's Servicing Company, as servicing agent for

25

LEHMAN SUB CAPITAL, its assignees and/or successors in interest, who may proceed with a foreclosure of and hold a Trustee's Sale of the subject Property and take all steps necessary to regain title, interest and possession in accordance with their contractual rights and statutory remedies on the property located and generally described as: 3236 E Presidio Rd. Phoenix, Arizona 85032, ("Property" herein) and legally described as follows:

> LOT 102 OF PARADISE VALLEY OAIS 2, ACCORDING TO BOOK 96 OF MAPS, PAGE 24 RECORDS OF MARICOPA COUNTY, ARIZONA.

and Secured Creditor may commence any action necessary to obtain complete possession of the subject Property.

IT IS FURTHER ORDERED that any proof of claim filed by America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL is hereby withdrawn.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the ten (10) day waiting period of Bankruptcy Rule 4001 is hereby waived.

Submitted by:

THE COOPER CASTLE LAW FIRM

By: _____ Date: _____
Michael W. Chen, Esq.
Attorney for Secured Creditor
America's Servicing Company, as servicing agent for LEHMAN SUB CAPITAL

NO OPPOSITION FILED / OPPOSITION FILED